and Mr. Peterson, whenever you're ready. Thank you, Judge. Your honors, may it please the court, Chap Peterson for the appellate, Melvin Murphy. This comes on a trial court dismissal on a 12B6 motion from the Eastern District of Virginia. The case originally arose from a one-count Virginia Consumer Protection Act case that was filed in Fairfax County. The undisputed facts are that my client, who is the appellant, was a former Marine who had enrolled in an online set of classes to what was called an organization of management with a specialization in leadership. He pursued that degree for essentially eight semesters as the school counted it. He basically took $70,000 that he paid out in tuition. Most was in loans, some was in cash. During that time, he had a commendable GPA of 3.75. He was recognized as a, quote, scholar, obtained a scholarship, and was told at all times that he was on pursuit for a PhD track. And as I said, he had paid out the entirety of the money. He then went into a process called the... The courses that he took were substantively in the business management area. Yes, your honor. We're not denying he took these courses and was under the impression that he was on track for the PhD. The complaint really seems to focus factually on the fact that when he got to the end of this program and took the test, he couldn't pass the test, that the offer to give him a master's as opposed to a PhD was a sham. Your honor, that's not the sham. The entire process was a sham. That's when it became manifest to him. He just agreed that he got the... He's there to get an education. Well, your honor, he's there to get a PhD. He's not that... I understand. Yes, sir. But he took the part, participated in his colloquies, colloquiums, whatever you want to call them. And up until the end, everything was fine. His grade point was fine. So he's in the program. He's learning the material. The material's consistent with what he expected. Now he takes the test, fails. And then they put on charges for remediation and so forth. And then at the end of that, he still can't pass the test. They say, well, we can give you an MA, but we can't give you a PhD. Now let me ask you, what is the motive of somebody who has a sham for not giving you a PhD as opposed to an MA if you did well on that exam? What is the motive? Yeah. What's the difference between a PhD if they're in the business of that? They apparently give out PhDs and they just give out few. And so really what you're saying is they treated him unjustly. Your Honor, I think, and this is where I don't want to get caught up in the narrative versus what the cause of action is. The narrative, and you say, what's their motive? Well, their motive is clearly to make money. They're a for-profit company. Except at the end, they got all the money. They milked him of the money. Now why wouldn't they give him the PhD then if he had done well? Your Honor, I don't know why they didn't give the PhD. It may be that under their accreditation that for every PhD, they have to somehow justify it. I don't know, Your Honor. Except if he did a good paper, as he alleges, then to give it to him is no problem. They give out PhDs. How do I know they give it? You alleged it. I did not. I alleged they didn't give out PhDs. You said 10%. No, I said in other programs. I said in the leadership, they gave out none. And in fact- No, you have no factual basis for that quite apart from the fact that he was in the program. Well, Your Honor, actually, I do have a factual basis because after he was disenrolled, the story of him alone is really not an interesting story. But what happened was after he disenrolled, he then contacted all the people that had been in this program with him. And they all were very similar. They were either active duty or prior military, African-American, living in Maryland or Virginia. Each one related the exact same fact. I don't know if we're allowed to go on the internet, but they went on the internet and listed several people who did get PhDs in this area. Your Honor, they put things on the internet and then put it in the appeals record. I mean, again, we weren't allowed to take discovery. The complaint is deficient also. It doesn't give that fact. The complaint says, based on the fact that I failed the test and I consulted with others who failed the test, it's a sham. No, Your Honor, here's what the sham is. The sham is they advertised a degree and they advertised people that were successful alumni. They said common job titles of people that obtained this degree. And they had 11 categories listed out, CEO, CFO, business consultants. Your Honor, I looked at your complaint and then I looked at what you relied on to support the complaint, which is that brochure. Yes, sir. And they didn't match. You said various things like Mr. Wynn was a fiction, he didn't exist. And then you said, well, he graduated before or he got a PhD. The complaint says, I've underlined them and it's not useful to go through. But if you look at the brochure, the brochure has people who got various degrees giving testimonials. And the testimonials often are like with respect to Mr. Wynn, the testimonial isn't even a testimonial. It says, I chose this program to further my career, so to speak. That's all he said. That's nothing about the program. That's nothing about the substance or the quality. But the notion that all those jobs, they have placed people. It basically says, these are the types of jobs you can get with a PhD. Your Honor, I have to disagree with you. And obviously, that's why I'm here. Fair enough. When they said- That's why we have oral arguments. I agree, Your Honor, and respectfully, Your Honor. No, you're doing fine. What I said is, the advertisement says, and it's in the record, and my colleagues, we agreed, what can I do with a PhD in organization and management with a specialization in leadership? And then it drops down to when it talks about common job titles, not potential job titles, not you could do this, common job titles, CEO, CFO, COO. This is on page A199. What can I do with a mathematics degree, common job, be an accountant, be a school teacher? I mean, this is saying that- But Your Honor, it is saying something. It's saying that actual people have earned this degree and hold these titles. These are common job titles. Don't say that. The word common job titles. Common job titles means titles that you would recognize that would, could you be useful. No, no, Your Honor. Common job titles means a job title that matches with that degree. So again, if it said potential job titles or potential uses, but I just fundamentally disagree with Your Honor. And again- Well, I'm looking at it here, and I must say it talks about what, how this might be useful when you go out into the world. And the answer, I mean, it's just normal fluff advertising. If you get a mathematics degree, you can go out and become a scientist. You can become, go to NASA. You can teach at Harvard. You can teach in high school. There's a lot of things you can do with a mathematics degree. Your Honor, I guess here's what it comes down. Here's the crux of my case. And obviously, we're either going to survive or not survive today. And we didn't survive at trial court, but here was the point. My client already had a master's. He already was a person in a professional setting. He chose to obtain this PhD thinking this was a legitimate degree program. He already had the master's. He- What makes it legitimate? He got the education. But Your Honor, and again, this is where I- He failed the exam. But if everybody fails the exam, if 100% of the people fail the exam, then at that point, is the exam actually weeding people out? Or again, is it just a method of- Did you allege that 100% of the people failed the exam? Did you allege in the complaint that 100% of the people failed the exam? Your Honor, I think what we allege is that every person that he contacted, all the people in his group had all the same thing where they had a high GPA and they had failed the exam. We never took discovery, so I don't know how many people failed the exam. I mean, I had to go online and do research from the congressional record to get the statistics that I received. I never had a chance to take discovery, so I have no idea what the actual numbers were. I had my client's experience. I had the people he spoke with and I spoke with who all had the exact same experience, which was a high GPA, being told they were on track for the PhD, failing the exam. This is an allegation. Of the students who enrolled seeking a doctorate in 2008 or 2009, less than 10% would actually receive such a degree. That's from the congressional record, Your Honor. I don't care where it's from. Yes, sir. That's the allegation of the complaint. Yes, sir. So we know that they do give the degree. That's of general degrees, not for this specific degree. I understand. Yes, sir. Then you also allege that he took the courses and during the whole period of time, he didn't complain about these courses not being consistent with the program. And that's because he, at the time, thought he was on track for the degree. I thought you're right. He was learning the material. This is an educational program. And he was involved in this business management degree, and he was taking courses, and he obviously thought they must have related. He participated in the colloquia. They had these discussions. He just didn't get the degree. He didn't pass the exam, and therefore didn't get the degree. Your Honor. That's the allegations of the complaint. The allegation is the only reason he enrolled in that class, was enrolled in that program, was not to learn abstract knowledge, or take classes, or spend a lot of time in classes. It was to obtain a Ph.D. Everybody who goes to college, or goes to an advanced program to get a Ph.D., does it for the purpose of completing the program and getting the degree, but not everybody succeeds. Well, Your Honor, if nobody succeeds, at some point, is it a legitimate program? And again, it comes down to a question, I suppose, of degree, where if nobody gets the degree, and again, we've alleged that in this leadership program, at the time it was being advertised, nobody was getting the degree. How long had this leadership program allegedly been in existence? We didn't allege that, but I believe that based on our research, it had been, the university itself had been in existence, I believe, five or six years. Leadership Ph.D., how long had it been? I'm not sure, Your Honor. That seems to go to at least some amount of time. In some instances, it can be quite long, and sometimes they actually give you, there's a dissertation, you may have years in which to complete that dissertation, and sometimes people never get it. Justice Wynn, my point would be that when he looked at... Let's call judges. Judges, I'm sorry, Judge Wynn. I apologize. When he looked at the advertisement, he looked at the marketing that he relied upon, and he noticed there were 11 categories of job titles, common job titles. The clear inference was that these were people that were successful alumni. What claim are you making this under? Which one of the claims are you claiming? Because we're at a 12B6 stage, and the judge has led you directly to the complaint, and so the best course of action for you would be to identify the particular claim that you allege you have, if we take those facts as true, that you have in that complaint. Don't have to look at anything else on 12B6. I agree. That's all you got to do, if you can do that. Here are the two claims, and they go hand in hand. Fraud, which is the false statements I've related, and then Virginia Consumer Protection Act, which is 59.1-198 at sequence. Under 59.1-198, this is clearly a consumer transaction. What facts have you set forth that was established, if taken true, that you have fraud? False and deceptive advertising that was relied upon by the consumer. That's number one. Not providing the services that advertised. Again, this is where I may disagree with Judge Niemeyer, but the fact that he took the program with the specific purpose of obtaining a Ph.D. and a Ph.D. path was not available. The penalty clause that I talked about, and this is a little bit more, where he was required to take the remedial... Where is the allegation in the complaint that the Ph.D. path was not available, other than in just the conclusion of the statement? Well, the fact that, again, everybody he contacted that was in his group, nobody obtained the Ph.D. The Ph.D. program, there were no Ph.D.s being awarded. Do you know when those people were in school, or when this occurred? Your Honor, they were in the school at the same time sequence, which was 2009 through 2012. But you almost got to exclude the class when you say it's a fictitious program, or when it doesn't exist. It can't just be everybody I contacted. I mean, doesn't it have to... I mean, if you're going to make an allegation of fraud on that level, and say this degree does not exist, you know, to contact, I don't know, it could have been 200 people in the program, Paul, I know. I don't know. You got to tell me something. I mean, we got some pleading requirements, and we're pretty liberal with it for the most part, but when it comes to this kind of thing, you got to have some specificity. And here in the complaint, what I need to hear from you is what is specific in that complaint that would lead us, if taken to be true, to the conclusion we have here. Your Honor, I would say that the fact that they were advertising that this was a Ph.D. program, in which, obviously, if you can't award a Ph.D., there's no program, that there were people who had completed the program that had these particular, quote, common job titles, that would be the false statements, really at the crux of the case, Your Honor. Would you have to say nobody has completed this program, not just everybody I contact? Well, I would say within that time frame when the statements were being made, in other words, the 2008-2009 time period, our allegation was there were no Ph.D.s being awarded at that time. Now, subsequently... Where's that allegation? Give me a paragraph. I believe in the false statements. If you look at the false statements, Your Honor, we've alleged specific... Well, I'll tell you one of the false statements. You say the existence of satisfied customers, like Mr. Wynne, were all repeated and reiterated. Existence of satisfied customers, like Mr. Wynne. Well, I looked at the Mr. Wynne thing. Mr. Wynne is quoted as saying, I chose the Master's Degree Program as a way to move myself forward and provide an edge return to civilian life. And then it underpass Sidney Wynne, M.S., Master's of Science. And the program he was in was the Ph.D. Organization and Management Program, and he was a major U.S. department. So he's somebody they represent. He's got an M.S., and he had an M.S., and they represent he chose the program to advance himself. Now, where you say he didn't even exist... I didn't say he didn't... We actually said we spoke to him, and he said he did not agree to have his name be used. Well, I understand, but students like Mr. Wynne who were advertised by Coppola as satisfied customers did not actually exist. That's part of your complaint. The fact he was a satisfied... We say he was no longer a student. And where does he say he's satisfied? He just says, basically, I chose the program to advance myself, and he clearly got an M.S. Your Honor. He says he chose the Master's Degree. And if I look at paragraph 25, and when we spoke to Mr. Wynne, he never agreed to allow his image, likeness, identity, or statements to be used in Coppola's marketing of a Ph.D. or this and any other program. The statement attributed to him was fabricated. These are allegations in our complaint. Yes, sir. Is there a statement here that he was satisfied? This is what you represented. I'm looking here at this page 164. It may be inferred that he was satisfied because he got a degree, but he completed. He got... He said he sought an M.S. Degree, Master's Degree. Your Honor, I agree. He doesn't use the word satisfied. I think it's a pretty... He doesn't even evaluate the program. Your Honor, I think... I would say pretty clearly that when he says, I chose a program as a way to move myself forward, he's clearly endorsing the program. This is an endorsement. I chose the Master's Degree program, is what he says. Yes, Your Honor, but it says Ph.D. in Organization and Management. He just left out the word Master's Program when you quoted what he said. So I was just correcting you. You said, I chose the program. Right. That's fair enough, Your Honor. But the point is that he is endorsing the program. Mr. Wynn is a side issue. Except it's one of your three. I agree, but... And the same problem with the others, the existence of the leadership, the Ph.D. degree. Right. You say the existence of it. Right. And then you have nothing to support it, even to the extent that your man was in that program. Your Honor, it's the degree, not the program. He was in that program. That's what you're talking about. I said the degree, not the program. I understand, but you get the degree at the end of the... When you complete the work. You don't. No, in any context. In other words, he was taking courses for two years. He got the education. He got pretty good grades, apparently. He took the exam and failed it. And after he failed a second time, they offered him a Master's. He said, I don't want it, and went. And that is the basis for an argument. And then he checked with others in his group, and they didn't get a Ph.D. And that's the basis for a fraud claim. And I have a hard time finding why that leads to fraud. Well, Your Honor, again, I think we've... The fact that there was any successful graduates of this program, and perhaps the court would agree with me, if there were no successful graduates, that that would perhaps be a program... Of course, they came up with a five or six. And again, Your Honor, I didn't get this in discovery. These are part of... I understand that, but I'm just saying, to make a categorical statement apart from the complaint, which doesn't say that, you can't make that statement unless you know they didn't have any successful graduates. What I said in the complaint was, we investigated. We had not found any. He had spoken to everybody you know, and they had all had similar... That's the best I could represent to the court, Your Honor, as an officer of the court. And is that fraud? It isn't from my perspective. When you advertise a program, and you advertise a degree that is not being awarded, and you advertise successful alumni that you do not have, that is a fraud. And it's certainly a violation of Consumer Protection Act, which is a remedial statute, which does not have the same standard as fraud, and specifically talks about deceptive advertising. I mean, if this case doesn't qualify as a violation of Consumer Protection Act in this circumstance, I almost wonder what case ever will, in regard to for-profit colleges. I really do. Okay. Thank you. We'll hear from Mr. O'Toole. Good morning, and may it please the Court. Brendan O'Toole, on behalf of Capella University. I just want to start with the fact, Judge Winn, you mentioned, you asked, when was the first time that the university awarded a degree in leadership? It was back in I just wanted to answer your question. The District Court's decision should be affirmed because Mr. Murphy's claims against the university are implausible. Throughout his amended complaint, and again, repeated multiple times to this Court, he alleges over and over again that the entire leadership PhD program... But it's implausible. Is that the standard? We're looking at this case in 12-B-6. Yes, sir. And essentially, what has to be shown is that even if we take the allegations in the complaint, then they are not sufficient to make out the claim. To state a plausible claim for relief for fraud and violation of the Virginia Consumer Protection... Will you take the plausible from Iqbal and the Supreme Court? Yes, Your Honor. Yes, Your Honor. And at the end of the day, what you've got are Mr. Murphy's own admissions in his amended complaint where he says Capel is accredited. He enrolled in the leadership PhD program. He received a course catalog that outlined the comps for him. But the basis of his complaint seems to be that you advertised something that you didn't intend to award a degree for. And I think as Judge Niemeyer pointed out, Judge Wynn, that there's no such representation or misrepresentations that's found in the record. If you look at the 2008 university guide, that doesn't make any representations whatsoever. You mean there's no such allegation made in a complaint that we, when we take it as true under 12b-6? What he's done is he's made a conclusory assertion. He's simply said that the entire program doesn't exist. You never get a degree. But he hasn't backed it up with any facts at all. The only facts that he's alleged to support that conclusory allegation are really twofold. One, I took the comps and failed, and I don't think the reasons that they cited me for, for failing, were fair. And two, I spoke with some other folks who enrolled in the program and they said... You said 50 other folks, wasn't it? 50 folks? 50 folks, however many it is, who said they had... None of them had gotten a degree. That's what, according to Mr. Wynn, that's what he alleges. But because those specific people... But according to our review, that is true. Okay. And he, what he also doesn't allege is how many... From the perspective that you agree with all... No, no, no. No, I'm with the standard of review, with the standard of review. But I understand you said as though that's what he alleges, as though that's not enough. That's a fact. He's alleged it. Well, I don't... We take it as true. We take it as true. Yes. And so I don't believe that that's enough for him to plausibly support or to get this to the stage of discovery, particularly, Judge, when, and I know there may be some question about this, when we've shown in our documents, page 29 to 31 of our brief, that there are people who during this exact same time period did, in fact, get this very degree. What document did you show that in? It's in, it's on page 29. The web, the thing you want us to take judicial notice of? Yes, sir, Judge, from a government website, from somebody who's a high-ranking official in the Pennsylvania government. That's what you want us to do? Well, Judge, here's what, Judge, when I would say it this way. If somebody came in and said, you know what, I took classes at Harvard Law School, I'm a minority, I took classes at Harvard Law School, and I failed out. I think the reason that they failed me out is not fair. And the reality is that Harvard is just designed to not, to weed out minorities, and they don't want to give... That information exists at the time the trial was there, that, in fact, there was such a, that these degrees had been awarded? You know, I don't know when this particular individual was appointed to this position in the Pennsylvania government, but I really don't know when that information was available. It's something that we... I mean, if you're being sued and you kind of know this thing is coming down the pipe, maybe then you decide to go ahead and do something you didn't intend to do. Well, I mean, I'd... Kind of gives you a little incentive, doesn't it? Well, getting back to, no, I mean, getting back to my point, what I'm talking about from a judicial notice perspective with the Harvard example is that if somebody said, you know... I think with the appellate, let's not talk about Harvard. Okay, what I'm talking about is if somebody went and said, you know, if I were to attach President Obama's resume from the White House to my appellate brief to show that people... I think that goes to the argument, in which I understand there's puffing, which you can advertise. But if you do so, and the ultimate intent is never to award the degree. Your intent is to, so to speak, milk students. Nobody passes the first comp. Nobody out of 50 students, you know, nobody, not one of them passes. So then you got to pay some more money. Then you come back, nobody passes the second one. Second one, you disenroll. And if you have evidence during the short span of a program from 2000 to whenever this is, and his allegation is not a one of those students. There have been 50 or so odd students in his program. Everyone went through the same kind of thing, and not a degree was awarded. And we take that as truth at the 12B6. But Judge Wentz, simply because people have not received a degree, certain number of people. First of all, he hasn't alleged how many people were in the PhD program. Could have been a lot more than 50. And I'll tell you, it was a lot more than 50. And that's true. I'm with you on that. What troubles me to some extent is we're at 12B6. And it may ultimately be that this is just an exercise that will resurface on a summer judgment or some other stage once the evidence is sort of brought out in the case. But if a student or someone comes in and says, you got this program. I spent all this money. I have written books. And then they told me I didn't pass the comp because I couldn't write. And then they gave me a $4,000 course in writing. And I got an E in it and came back again. I didn't pass the comp. Maybe for a different reason. I don't know. And then, ultimately, he's disenrolled. And then they said, well, you can appeal. And he comes back and says, well, we'll give you a master's. You can pay us another $4,000 to take another course. You know, I'm just dealing with his allegations, his naked allegations here at this stage of the ballgame in terms of the elements of fraud. And I, Judge, my response to that would be that I don't think because he alleges that certain people didn't receive a degree means that the leadership PhD program did not, in fact, exist. I mean, the reality is that he says that he participated in the program. He received a catalog that explained how the comps worked. He was reviewed by professors. He got a scholarship of $5,000 from the university. And he was reviewed not once. He was flagged for bad writing. And in conjunction with what you're talking about, the fact that he got good grades in the coursework doesn't ipso facto mean you're just going to pass through just pro forma at the comp stage and then pro forma at the dissertation stage? Well, his allegations are somewhat broader. And that is he goes on to say, well, there's no intention to even help students along the way. The idea is, you know, you admit students. There have been instances in analogous situations that are not applicable here where you admit students that you kind of know they're not going to be, they're not material for this degree. But your purpose is not to give them a degree. It's basically just put them in the program and you just continue to milk them along. And then when you get at the very end, he says, oh, you don't qualify. We disenroll you. We'll give you something else. And I'm sorry. No, no, no. And as Judge Niemeyer kind of alluded to, I believe, what would the university's point be for doing that? I mean, if he's, if they've already milked him for all the money. With whomever they are being accredited by, if they know they have certain standards in the people by, if it is, I don't know if it's either it is or it's not. But if you've got legitimate people that were PhDs, academicians have a little jealousy about what they have. They're not going to give it to everybody. But if they understand we're not giving it, really giving this PhD out, what we're going to do is let you get here and then we'll give you a master's down the road. But we don't give PhDs out to everybody. I mean, that's kind of, I'm not, even though motive is really not what we're talking about here. It's not a question of motive. It's a question of, has he sufficiently alleged facts that say that you advertise the program that you had no intentions of giving a PhD for? And again, Judge, I just don't believe that the fact that you have people who have not received the degree, when he doesn't say, you know, he doesn't say every single person who ever enrolled in the leadership PhD program, nobody ever got a degree. He says he spoke to 50 people and including himself. They didn't pass the comps. It's a rediscovery. And at this point in time, I don't know what you can allege. I don't know if you can get that kind of information, rediscovery. I don't know if he could have alleged upon information and believe everybody. Nobody got it. Because when I went and got 60 folks and who just like me went through this program, not a one of them got a degree. They all went through the same stuff I did. Not a one of them got a degree. Well, I don't really think that that's what he truly alleges. Because what he alleges throughout the lawsuit is that the entire program doesn't exist, start to finish. And as Judge Niemeyer said, he admitted in his complaint that there is a percentage of students who do receive PhD degrees from the university. Well, that's not the leadership program. And that's correct. It's say the 10%. But I think it's fair to say that's alluding to the 10% in the other program. But the question is the leadership PhD program. And he's contacted 50 students. A lot of students in the program, not a one of them get a degree or for them to complete substantially all of it. I mean, typically, if you're not going to make it, someone's going to drop you the first year and tell you you're not going to make it or whatever. PhD degree is not meant to be an easy accomplishment for anybody, Judge Winn. That's exactly right. And you're not supposed to be getting in the program if you don't have the stuff to get it. It's much like a law degree. I mean, you could pretty much let anybody into your law school. But if you know they're not going to make it or ever pass the bar, that's why you have standards for it. And I don't know. I'm just looking at his allegations. And I want to look in that lens. We've had a lot of discussion about motive and other stuff. But really, it all comes down to just looking on all fours here. And without the benefit of the judicial notice that you want us to take for this website information, I'm uneasy about that. I'm not saying it doesn't exist. And I agree. It's definitely on point to be there, assuming, you know, depending on when it happened. But I'm just wondering, what does it mean to simply just allow this to proceed to discovery and all of these things that are here is true? It's going to be a pretty quick little situation. You're talking about summary judgment? Yeah, if that could be your tactic. I mean, you may choose to move for the summary judgment if you went back and you all of a sudden come up and say, look here, I've got people, here's a bunch of people who's got this degree. So that's no good. But Judge Nguyen, what that does is it renders essentially meaningless. Rule 9b in the Supreme Court's decisions in Twombly and Iqbal. I mean, we've got cases where you can't just come in with conclusory allegations and say, well, something doesn't exist, or they never- He didn't come in just conclusively. He got 50 folks. 50 folks, Judge. But again, we don't know how many people are in the program. How many people did you have in the program? Well, I can't make that representation. Sounds like a lot for a leadership PhD program for any period of time. Most schools may have two or three PhD students in a particular program. I go to a lot of graduation exercises. I never see 15 or 20 in one degree anywhere come across. I'm just trying to think on this thing a little bit. 50 sounds like a lot to be in a particular program. It sounds like a lot to me. 50 sounds like a lot. Well, you're not talking about this university being in existence since 1890. You told me 2005, but it couldn't have been any more than when it's been in existence, which was when did it come in existence, the university? Did they first award it? Yeah. The university or the degree? When did they first start awarding the PhD? 2002. In this program? In any program. In the late 90s? Early 90s? So on that time period, even if you had that, 50 students in one PhD program is a lot. Isn't it? It very well might be. I don't know. I mean, I don't think there's anything in the record that, again, says- But those are the kind of facts that could come out. And again, maybe it does prolong it if we did do anything different with it. Maybe inevitable, this is what happens with it. But it seems that the 12B6 stage, if we're going to be true to it, even in light of the specificity required, you know, in other cases, you know, still to allege those kind of facts, if we don't take judicial notice of the fact, there seems to be pretty strong evidence that maybe you weren't awarding this degree. From a student who admits in his papers that he plagiarized? And a student who admits that his writing wasn't good enough? The basis for saying he plagiarized, if he plagiarized, he probably wouldn't have let his appeal come back to give another shot at it. But I don't know about that ellipsis and all that kind of stuff. If that's plagiarism, that happens all over the place. But I don't want to get into the specifics of that. I mean, that wasn't the basis the first time around. And I don't- Well, the point is that they didn't- Don't think to me he attributed it to something, but he just didn't tell you what it was. Well, I mean, in the courts, I think the Supreme Court said time and again, and this court has said, you don't second guess the judgment of professors. Wouldn't want to do that. But would want to hold you to the responsibility of saying on a 12B6 stage, we take this complaint as true, which is what we'll do, even if we're following the talk here. We'll go back, look at this thing, lay it down, and see if we take every word of his truth. Does it meet the standard of saying that's sufficient this stage? Because 12B6 is tough, even at the pro stage, for what he's alleged to do. It's a high- In terms of how do you prove this case? If, in fact, it was true, how would you ever prove this case? You'd have to conduct- I don't know. I don't know what you have to do. You probably have to go into freedom of information. I don't know how you get all that information. But it would be difficult. Correct. The only other thing, I know my time is getting short, is I just wanted to touch briefly on the concealment arguments, his theories there. I think that all of the arguments, the facts that he alleged were concealed from him, that those all fail for two different reasons. One, I don't think the university had a duty to disclose any of these facts that he's alleged were hidden from him to him. Well, they're mostly just inverse reflections on some affirmative misrepresentations. I'm not sure how they fit. Well, for example, I mean, how much money the university uses from a student's tuition and invested in academic curriculum versus the president's salary or infrastructure. I mean, there's nothing in the law or a statute or regulation that requires a university to disclose that kind of information. So we think that the argument on the concealment theory fails. If there are no further questions, then I will go ahead and sit down and respectfully request that the district court's decision be affirmed. Thank you, Mr. O'Toole. Mr. Pearson. Your Honor, just briefly, I don't want to overstay my welcome here, and I know it's been a long day. I just simply say that the issue about the program. You're always welcome here to present a case as a lawyer. Thank you, Your Honor. We're not giving you an indication you're not welcome here. Thank you. You might get rigorous questions, but it doesn't have anything to do with your being welcome. Thank you, Judge. Well, I'm glad to be here, and I've enjoyed my time here. And the only two things I'd reiterate on the plagiarism aspect, I think what we laid out pretty specifically in our complaint was, it was a misplaced quotation mark, and we use that as an example of the pretextual nature of the comps. And again, these are our allegations, but that was part of the fact that we believe that the comps is being used to intentionally disenroll students. But again, you need to hone in on your allegation and the complaint so far as taking it through how it meets that allegation. One of the things you may, seems like you may want to, the questions of whether you allege that the program was fictitious or that the degree was fictitious. The opportunity, the program, we believe, existed to some extent that you could take classes. The fact that there were degrees being awarded, that was fictitious, that there were no degrees being awarded. And again, our due diligence on this, what we did was my client, as you- How did you get those 50 or 60 votes? My client actually had these meetings called colloquia, where they would bring people together. My client was a very social person. He collected emails and phone numbers. And after he had been disenrolled, he actually contacted people and spoke with people and gave me names and numbers. I spoke with people and talked with people all up and down, primarily North- Is that a public record as to who had been enrolled in this program? Your Honor, it's not. And you mentioned FOIA. This is a private university. How about 50 of those people were enrolled in the PhD leadership program, correct? Actually, they were, because that was the colloquia. Why does it say most in your complaint at paragraph 72, most of these students were pursuing a doctoral degree in the same program? What's most of mean then? Well, Your Honor, maybe I said most because I didn't want to say absolutely all 50. But I can tell you that when they had these colloquia, which is described- It starts with most. That's what's in that complaint. Right. That's what we're going to take as proof. That's fine. Let's say 26. And again, in the- For purposes of 26, yes, not all. Not all. That's correct. Obviously, there was at least one was not because I put most and not all. But the bottom line was most of them were because, again, they had these colloquia. People would be brought together who were in the same degree program. And again, each one of these persons related the same experience where they were in the program. They had good grades. They were kept in for the entire process. And they paid out at least $60,000 in tuition. And then were disenrolled after failing the comps. A single person that my client spoke with talked about going through that process. And I guess the point I close on, Justice Wynn, excuse me, Judge Wynn, is exactly what you mentioned earlier, that we had no opportunity. We never took discovery in this case. We had no opportunity short of breaking into their office and going through their files to know how many people are in this program and how many got degrees or didn't get degrees. We did the due diligence on our end. You have to be able to come up with a claim that's plausible. I believe this claim is plausible, Judge. Well, I understand. And when we measure plausibility, the Supreme Court has suggested that you come forth with facts that make it plausible. And plausibility would have some rationality, evaluation of rationality and consistency. And most of your complaint relies on the two brochures. And there are these facts, these conversations with the students. The counselors, Your Honor. Well, the counselors, right. And I started comparing what you were alleging in the complaint when you were alleging something that was represented in the brochure. And I found a disconnect. I didn't find it plausible what you were alleging based on that. Now, the question that Judge Wynn is focusing in on is, is it enough, is it plausible that there is fraud when you have a school that has an enrollment of 38,000 people and you spoke to 50 people, none of whom were able to get a Ph.D. in a process where they failed the comps? It may be consistent with fraud, it may not. But the question is, is that a plausible fraud claim? And Your Honor, if they advertised a degree program and said that if you take these classes and you are successful, you will obtain this degree. No, no, no school says it requires you to perform. I mean, Your Honor, I understand that. But they say there's an opportunity for a degree. And we speak to 50, 40, 38 people, all of whom were in the same process. They live in Maryland and Virginia. They paid the money. They took the classes. They got good grades. They all got disenrolled. They failed the comps once. They failed the comps twice. We did not find a single person that was a success in this program. At what point does this, the program itself, become a fraud? And Your Honor, again, I have no way of investigating these facts. There's no freedom of information. This is not a public university. There's no window into this situation. If it turned out, as the court noted correctly, that... When I took the bar exam in Maryland, the year before I took the bar exam, only 32% passed. 67% failed in Maryland, the bar exam. That was a normal figure. That's pretty high. What kind of conclusion? Can I conclude that... Well, people obviously pass the bar exam because they practice law. Where are the people that have this degree? Well, that isn't the question. The question is, if you speak to a percentage, maybe a small percentage, maybe a large percentage, of students with whom you had contact, is that... And they didn't see you falsely lead to fraud? Your Honor, again, obviously, we believe that the way this program was portrayed to my client was deceptive. It was misleading, fraudulent. Again, and I think the judge went alluded to this. If we take discovery and the facts aren't there, the facts aren't there, and it wouldn't be the first or last time the case would be withdrawn. But at this point, I don't have any evidence showing that this... Anything my client experienced, what he alleged, is in any way not relevant, not plausible. I believe it is plausible. Okay. Thank you, Your Honor. Thank you for your argument, Will.
judges: Paul V. Niemeyer, James A. Wynn, Jr., Stephanie D. Thacker